**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **AUTOMOTIVE HARDWARE** | ) | |
| **SERVICE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:08-CV-202** |
| | ) | |
| **ACCUBUILT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Automotive Hardware Service, Inc. ("AHS") brings this breach of contract action against Defendant Accubuilt, Inc., alleging that Accubuilt breached its requirements contract with AHS when it stopped ordering paint from AHS six months before the end of the contract term.[1] (Docket # 1.)  The parties have now filed cross-motions for summary judgment. (Docket # 22, 23.)  AHS requests a determination that its contract with Accubuilt was a requirements contract that Accubuilt breached, while Accubuilt asserts that it was not obliged to purchase any paint from AHS, and consequently, AHS's breach of contract claim should be dismissed as a matter of law.

For the following reasons, Accubuilt's motion for summary judgment will be GRANTED IN PART and DENIED IN PART, and AHS's motion for summary judgment will be DENIED.

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff AHS, which is headquartered in Fort Wayne, Indiana, is a regional distributor and retailer of BASF brand paints and supplies to the automotive industry with distribution locations in Elkhart, Indiana, and Lima, Ohio. (Lahrman Dep. 9-10, 13-14; Lahrman Aff. ¶ 2; Compl. ¶ 5.)  Defendant Accubuilt, which is headquartered in Lima, Ohio, is a speciality vehicle manufacturer with three manufacturing facilities. (Schlueter Decl. ¶ 2.)  It builds funeral coaches, executive sedans, and limousines in Lima, Ohio; large luxury limousines in Springfield, Missouri; and commercial and personal use trucks and vans in Elkhart, Indiana. (Schlueter Decl. ¶ 3.)

With one or two exceptions, Accubuilt purchased paint exclusively from AHS for its Lima plant from the late 1980's through July 2008.[2] (Lahrman Dep. 114; Cuzzocrea Aff. ¶ 4; Smith Aff. ¶ 7; Andrews Aff. ¶ 6.)  In fact, in 1993 or 1994, Accubuilt encouraged AHS to build a new distribution facility adjacent to Accubuilt's new manufacturing facility in Lima in order to facilitate Accubuilt's "just in time" manufacturing model. (Cuzzocrea Aff. ¶ 3.)  AHS, however, never supplied paint to Accubuilt's Springfield plant, and it did not supply paint to Accubuilt's Elkhart plant prior to mid-2007.[3] (Schlueter Aff. ¶¶ 4, 5.)

---

[2] There was a brief period of time in the late 1990's when Accubuilt used paint from ICI on partially finished limousines that were furnished by Eureka, a limousine manufacturer in Norwalk, Ohio, that Accubuilt acquired. (Lahrman Aff. ¶¶ 4-6.)  The ICI paint had been previously purchased by Eureka and was transferred to Accubuilt's Lima facility in order to finish the partially-completed Eureka vehicles. (Lahrman Aff. ¶¶ 4-6.)  Thereafter, no other Accubuilt vehicles were painted with ICI paint. (Lahrman Aff. ¶¶ 4-6.)

Though AHS asserts that it also supplied the paint for Accubuilt's "special" orders (Colley Aff. ¶ 6), the testimony is mixed on this point, as Kevin Kaufman, Accubuilt's Materials Manager, states that Accubuilt at times used another supplier to obtain "speciality paint" for special orders. (Kaufman Dep. 11.)

[3] Accubuilt used DuPont brand paint for its Springfield plant. (Schlueter Decl. ¶ 4.)

## A. *Formation of the Contract In Dispute*

In mid-2006, Accubuilt requested quotations for paint. (Lahrman Dep. 14; Def.'s Br. in Supp. 3.) On or about July 26, 2006, AHS presented a price list ("Price List") to Accubuilt.[4]

---

[4] AHS contends that a letter (the "Letter") was attached to the Price List it delivered to Accubuilt on October 26, 2006, but Accubuilt disputes this assertion, stating that it received only the Price List, not the Letter. (Schlueter Dep. 13-14; Kaufman Dep. 60-61.) The Letter, however, does not necessitate extended discussion at this point because, as explained later, Accubuilt's motion for summary judgment must be denied even if the Letter is not considered, and with respect to AHS's summary judgment motion, the Court must credit Accubuilt's version of the facts–that is, that Accubuilt never received the Letter in October 2006.

Nonetheless, for purposes of completeness, the Letter, addressed to Accubuilt in Lima and signed by Scott Lahrman, President of AHS, reads as follows:

> THANK YOU FOR THE OPPORTUNITY TO PRESENT THIS QUOTATION FOR YOUR REFINISH REQUIREMENTS. INCLUDED IS A COMPREHENSIVE LIST OF PRODUCTS THAT ARE CURRENTLY BEING USED ON LINE. THE PRICE DATA BEING SUBMITTED SHOWS THE CURRENT PRICE LEVELS THROUGH 2006 (PO# 10759) AND THE UPDATED QUOTE FOR CALENDAR YEARS 2007 – 2008.
>
> THIS TASK HAS BEEN EXTREMELY DIFFICULT DUE TO THE GLOBAL PRICE PRESSURES AND UNPRECEDENTED VOLATILITY IN THE PETROLEUM INDUSTRY. ALTHOUGH WE REMAIN VERY CAUTIOUS PRESENTING ACCUBUILT WITH A FIRM TWO YEAR PROPOSAL, WE ARE COMMITTED TO THE QUALITY AND SERVICE ACCUBUILT HAS GROWN ACCUSTOMED TO.
>
> ALL PAINT COMPANIES HAVE RAISED THEIR PRICES RANGING FROM 25% - 30% AND BASF IS NO EXCEPTION. WITH THAT SAID, AUTOMOTIVE HARDWARE IS VERY EXCITED TO PRESENT TO YOU AN UPDATED QUOTE ON BASF DIAMONT PRODUCTS THAT FALL WELL BELOW THESE INDUSTRY STANDARDS. FOR CALENDAR YEAR 2007 WE SUBMIT A MODEST PRICE INCREASE OF 8.5% AND FOR CALENDAR YEAR 2008 AN INCREASE OF 4%. BOTH ARE SUBJECT TO ANY DRAMATIC GLOBAL CHANGES.
>
> AS IN THE PAST, TERMS OF SALE REMAIN THE SAME. WE OFFER A 5% DISCOUNT ON ALL PAINT PURCHASES THAT ARE PAID FOR WEEKLY. OUR FT. WAYNE OFFICE WILL COORDINATE WITH YOUR ACCOUNTS PAYABLE DEPARTMENT TO PRODUCE A STATEMENT FOR YOU TO RECONCILE. PAYMENT IS THEN MADE ON WEDNESDAY AFTERNOONS. ALSO AUTOMOTIVE HARDWARE IS EXTREMELY COMMITTED TO SERVICING YOUR ACCOUNT. CORPORATELY WE SPEND IN EXCESS OF 90 HOURS/WEEK BETWEEN THE LIMA AND FT. WAYNE FACILITIES TO GENERATE THAT SERVICE. TODAY'S REFINISH INDUSTRY ALSO DEMANDS CONTINUAL TRAINING IN BOTH LIQUID AND ALLIED PRODUCTS. WE WILL CONTINUE TO KEEP ACCUBUILT AT THE CUTTING EDGE.
>
> LASTLY, TIMING IS CRUCIAL!! WE EXPECT THAT BOTH RAW MATERIALS AND TRANSPORTATION COSTS WILL CONTINUE TO ESCALATE. IN ORDER FOR AUTOMOTIVE HARDWARE & BASF TO SECURE THE LOGISTICS OF THIS PROPOSAL, WE ARE RESPECTFULLY ASKING ACCUBUILT TO EXPEDITE A DECISION AS SOON AS POSSIBLE. WORKING TOGETHER WE CAN HELP ACCUBUILT ACHIEVE A COST CONTAINMENT SITUATION FOR THE NEXT TWO YEARS.
>
> AS ALWAYS, THANK YOU IN ADVANCE FOR YOUR CONTINUED SUPPORT. YOUR BUSINESS IS VERY IMPORTANT TO US AND WE WILL DO EVERYTHING POSSIBLE TO REMAIN IN YOUR CONFIDENCE.

(Def.'s Br. in Supp. Ex. H.)

(Lahrman Dep. 14.) The Price List consisted of two pages of product numbers and descriptions, their then-current price, and their proposed prices for 2007 and 2008. (Def.'s Br. in Supp. Ex. G.) When Accubuilt took no immediate action, AHS followed up the next month but still with no result. (Fuelling Dep. 22; Lahrman Dep. 22.)

Then, on or about October 26, 2006, at AHS's request, representatives of Accubuilt met with representatives of AHS to discuss Accubuilt's paint requirements for calendar years 2007 and 2008.[5] (Lahrman Dep. 17, 21, 23; Cuzzocrea Aff. ¶¶ 5, 6.) During the course of the meeting, Dominic Cuzzocrea, Accubuilt's Chief Executive Officer at the time, announced that Accubuilt would issue a purchase order to AHS. (Cuzzocrea Aff. ¶ 8; Smith Aff. ¶ 6.) He advised Scott Lahrman, AHS's owner, that Accubuilt would get the purchase order issued within the time frame requested. (Cuzzocrea Aff. ¶ 8; Smith Aff. ¶ 6.) Cuzzocrea now states that at the time he made this decision, it was his intention that the exclusive relationship between AHS and Accubuilt would continue for calendar years 2007 and 2008, through and including December 31, 2008. (Cuzzocrea Aff. ¶¶ 9, 10; *see also* Smith Aff. ¶ 7 (stating that it was also his understanding that AHS would be Accubuilt's exclusive supplier for 2007 and 2008).)

Accubuilt, however, asserts that the Blanket Order was issued at the direction of Dennis Schlueter, Accubuilt's Chief Operating Officer, and that he had the "final say" on Accubuilt's behalf at that time. (Kaufman Dep. 34-35.) Schlueter recalls that AHS's "presentation of their proposal for the next two (2) years of supply" was discussed at the meeting and that "there was

---

[5] Present at the meeting on behalf of AHS were Scott Lahrman, Owner; Jerry Colley, Technical Service Specialist; and John Fuelling, Store Manager. (Def.'s Br. in Supp. 2; Lahrman Dep. 16; Cuzzocrea Aff. ¶ 15.) Present on Accubuilt's behalf were Dominic Cuzzocrea, Chief Executive Officer; Brad Smith, Director of Operations; Dennis Schlueter, Chief Operating Officer; and Kevin Kaufman, Purchasing Manager. (Lahrman Dep. 16; Cuzzocrea Aff. ¶ 5.)

agreement to go forward with [AHS] as the supplier", but asserts that "all this blanket order did was identify pricing on a list of materials for a given period of time. There was no commitment there for quantities." (Schlueter Dep. 55.) Kevin Kaufman, who drafted the Blanket Order for Accubuilt at Schlueter's direction, testified similarly. (Kaufman Dep. 61.) The day following the meeting, October 27, 2006, AHS issued an amended Price List to Accubuilt, adding a number of products from the BASF Glasurit brand. (Def.'s Br. in Supp. Ex. G.) A few days later, on or about October 30, 2006, Accubuilt issued a purchase order (# 15965) (the "Blanket Order") to AHS, which was initialed by Schlueter and is reproduced in relevant part below:

| Line Nbr | Req Qty/ Unit of Measure | Reference Revision ID | Description/ Mfg ID | Req Date/ Taxable | Unit Price | Extended Price |
|---|---|---|---|---|---|---|
| 1 | 0.00 | | BLANKET ORDER WILL BE IN EFFECT FROM 1/2/07 THRU 12/31/08 WITH NO VARIATIONS HENCEFORTH | 12/31/2008 | $0.0000 | $0.00 |
| | Each | | | No | | |
| | | | Special Text: TERMS OF SALE ARE 5% DISCOUNT ON ALL PAINT PURCHASES THAT ARE PAID FOR WEEKLY. THE FORT WAYNE OFFICE WILL COORDINATE WITH OUR ACCOUNTS PAYABLE DEPARTMENT TO PRODUCE A STATEMENT FOR US TO RECONCILE. PRICING TO BE AS STATED ON QUOTE DATED 7/26/06 AND ATTACHED TO THIS PURCHASE ORDER. REVISED 10/27/06 TO INCLUDE GLASURIT. ALL SERVICE LEVELS ARE TO REMAIN AS WITH PAST PERFORMANCE. | | | |
| | | | | | PO Total: | $0.00 |

(Def.'s Br. in Supp. Exs. B, L.) The amended Price List, but not the Letter, was attached to the Blanket Order and was also initialed by Schlueter. (Def.'s Br. in Supp. Ex. B.) On November 7, 2006, Lahrman, AHS's owner, signed his name to the Blanket Order and each page of the Price List under the stamp "acknowledgment" and returned it to Accubuilt. (Def.'s Br. in Supp. 6, Ex. L.)

*B. Performance of the Contract In Dispute*

Upon receipt of the Blanket Order, Lahrman verbally notified BASF of its issuance, and from late 2006 through November 2007, AHS ordered paint products from BASF in order to service the Accubuilt account for calendar years 2007 and 2008. (Lahrman Dep. 22, 32, Exs. 22-24.)  By November 2007, AHS had all of the BASF products that it needed to service Accubuilt's account. (Lahrman Dep. 22, 32, Exs. 22-24.)

In January 2007, the parties began performance of the contract, determining what quantities would actually be delivered to Accubuilt's Lima facility through daily written releases issued by Accubuilt (the "Daily Releases"). (Def.'s Br. in Supp. Ex. C; Sevitz Dep. 20; Kaufman Dep. 61; Colley Dep. 39-40.)  AHS would pick up a Daily Release at Accubuilt's Lima storeroom (which is located next door to AHS's Lima facility), pull the paint from AHS's warehouse, mix it and place it into cans, and then deliver it to Accubuilt's storeroom the next morning. (Fuelling Dep. 11, 29, 35; Colley Dep. 39-40.)  In addition to supplying the paint, AHS had personnel service Accubuilt's account.[6] (Colley Dep. 5-6; Fuelling Dep. 5.)

In July 2007, Accubuilt published a company newsletter that stated in pertinent part: "Every Accubuilt funeral vehicle receives at least six coats of primer, a base coat and clear coat. Scientifically advanced BASF paint and paint materials are used exclusively." (Lahrman Aff. ¶ 7, 8, Ex. 2; Colley Aff. ¶ 10, Ex. 1; Schlueter Dep. 40-42, Exs. 4, 5.)  Accubuilt's website also contained the same statement. (Lahrman Aff. ¶ 7, Ex. 1; Schlueter Dep. 40-42, Exs. 4, 5.)  AHS

---

[6] For example, on rare occasions, Accubuilt would receive a special order from a customer requesting a specific type of paint color other than what was in the BASF catalog. (Colley Aff. ¶¶ 4-6.)  In those situations, Accubuilt would place an order for the special requests through AHS personnel located in Lima. (Colley Aff. ¶¶ 4-6.)  AHS personnel would, through BASF analysis, obtain a formula for such color, mix it at the AHS Lima facility using BASF paint product, and deliver it to Accubuilt. (Colley Aff. ¶¶ 4-6.)

was the exclusive distributor for BASF paint in the Lima, Ohio, area and northern Indiana at the time. (Lahrman Aff. ¶ 2.)  In 2008, Accubuilt's personnel inspected the inventory at AHS's Lima facility and determined that AHS had sufficient inventory to service Accubuilt. (Kaufman Dep. 40-41; Schlueter Dep. 55-56.)

### C. Accubuilt Encounters Quality Issues With AHS's Paint

In 2006, Accubuilt experienced a problem with mismatched paint on customer vehicles. (Sevitz Dep. 47.)  It investigated the problem, and the investigation caused Accubuilt to switch from BASF Diamont clear coat to Glasurit clear, and the mismatch went away. (Sevitz Dep. 54.) Unfortunately, the switch to Glasurit introduced other problems, such as peeling and sagging. (Sevitz Dep. 62.)  BASF representatives were called in and alternatives were tried, but they were unsuccessful. (Sevitz Dep. 62.)  Accubuilt concluded that the Glasurit paint process did not work well in an assembly-line environment where the vehicles had to move down the line at a particular pace. (Sevitz. Dep. 61.)  AHS, however, states that the problems Accubuilt encountered were not due to the paint's quality, but rather were a result of actions by Accubuilt's employees. (Cuzzocrea Aff. ¶ 13; Smith Aff. ¶ 8; Andrews Aff. ¶¶ 3-5.)

In any event, Accubuilt began investigating alternative paint suppliers. (Sevitz. Dep. 61.) It commenced a review in which it considered presentations and tests from different alternative suppliers, and it invited and encouraged AHS to submit its own proposal. (Sevitz Dep. 73-74, 84.)  In April 2008, AHS submitted a proposal for the 2009 Accubuilt work. (Def.'s Br. in Supp. Ex. A.)  In one section of the proposal, AHS set forth a list of "services provided to Accubuilt" in which it listed "no minimum purchase requirements". (Def.'s Br. in Supp. Ex. A.)

On May 23, 2008, Lahrman received a telephone call from Schlueter of Accubuilt,

informing Lahrman that he felt Accubuilt had met its "dollar" requirement for the contract. (Lahrman Dep. 112.) Lahrman then corrected Schlueter, emphasizing that the contract "was a volume requirement based on the calendar." (Lahrman Dep. 112.)

One month later, on June 20, 2008, Lahrman received another telephone call from Schlueter, advising him that because AHS was not "exclusive" Accubuilt had no obligation to purchase paint from AHS for calendar years 2007 and 2008.[7] (Lahrman Dep. 58-59.) Schlueter then advised Lahrman that Accubuilt was going to "terminate because we don't have an exclusive agreement." (Lahrman Dep. 58-59.) Then, in July 2008, Accubuilt began purchasing its paint from Dupont, who scored the highest on Accubuilt's review of alternative suppliers.[8] (Keiber Dep. 31-33; Schlueter Dep. 48, 54; Def.'s Br. in Supp. Ex. P.)

### D. Accubuilt's Elkhart Facility

Accubuilt was not painting vehicles in-house at its Elkhart plant at the time the Blanket Order for the Lima facility was issued in October 2006. (Schlueter Decl. ¶ 5.) That is, historically, Accubuilt outsourced its painting of vehicles manufactured at the Elkhart plant, sending the work to several third-party vendors. (Schlueter Decl. ¶ 5.)

In the middle of 2006, however, Accubuilt moved an existing manufacturing line (vans) out of its Lima facility to the Elkhart plant. (Colley Aff. ¶ 7.) AHS asserts that around the time of the transfer of this line, Tom Kauble, Accubuilt's Technical Director, asked Jerry Colley of

---

[7] During the term of the contract, Jerry Colley, AHS's Technical Service Specialist, had conversations with Mike Simon and Greg Corona of Accubuilt. (Colley Dep 57-58.) Simon told Colley that if it were up to him he would not change anything, and Corona told Colley that AHS "had nothing to worry about", that AHS was not "going anywhere [and] nothing was going to change." (Colley Dep. 57-58.)

[8] As part of the arrangement, Dupont agreed to reimburse Accubuilt for capital improvements to its paint booths. (Keiber Dep. 31; Schlueter Dep. 48, 54.)

AHS if it would supply BASF paint products to the Elkhart plant "under the same terms and conditions as were being done for the Lima, Ohio, manufacturing facility." (Colley Aff. ¶¶ 7, 8.) Accubuilt denies that Kauble made any such request. (Def.'s Resp. 6.)  In any event, it is undisputed that the supply needs of the Elkhart plant were not discussed in that October 2006 meeting. (Kaufman Dep. 62.)

Some ten months after the van work went to Elkhart, in April 2007, Accubuilt began painting vehicles manufactured at Elkhart in-house, purchasing paint for these vehicles at a five percent discount from AHS d/b/a Dick & Dave's Automotive Color, located in Elkhart. (Lahrman Suppl. Aff. ¶¶ 4, 7.)  To do so, and unlike the Daily Release procedure used in Lima, Accubuilt issued purchase orders to Dick & Dave's every day or every other day, reflecting precise quantities, product descriptions, and for the most part, prices (the "Elkhart Purchase Orders").[9] (Lahrman Dep. 13; Def.'s Br. in Supp. Ex. D.)  Prior to the transfer of the van line to Elkhart, AHS had been supplying paint for that line in Lima. (Colley Aff. ¶ 9.)  The volume of Accubuilt's paint purchases in Elkhart was small in comparison to Lima. (Lahrman Dep. 13.)

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record,

---

[9] Between April 30, 2007, and September 24, 2008, Accubuilt issued 179 Elkhart Purchase Orders to AHS. (Def.'s Br. in Supp. Ex. D.)  Some of the products purchased for the Elkhart plant were not included on the Price List created in October 2006, and some discrepancies existed between the prices charged in Lima and Elkhart. (*Compare* Def.'s Br. in Supp. Ex. B, *with* Def.'s Br. in Supp. Ex. D.)

whether there is any material dispute of fact that requires a trial." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 (7th Cir. 2008) (quoting *Payne*, 337 F.3d at 770). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

"When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *M.O. v. Ind. Dept. of Educ.*, No. 2:07-CV-175-TS, 2009 WL 857548, at *3 (N.D. Ind. Mar. 31, 2009) (alteration in original) (citing *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). "The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of judgment as a matter of law against it." *Id.* (citation omitted); *see Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984). "It is true that cross-motions for summary judgment do not waive the right to a trial, but this rule does not alter the respective burdens on cross-motions for summary judgment–more particularly here, the responsive burden of a plaintiff who moves for summary judgment and is confronted with a cross-motion for summary judgment. The motions are treated separately." *McKinney v. Cadleway Props., Inc.*,

548 F.3d 496, 504 (7th Cir. 2008) (citations omitted); *M.O.*, 2009 WL 857548, at *3.

## IV. DISCUSSION

The parties do not dispute that they had a contractual relationship in 2007 and 2008; rather, their arguments center on the interpretation of that contract's terms. That is, the dispute centers on whether the contract obligated Accubuilt to purchase all of its paint requirements from AHS for its Lima, Ohio, and Elkhart, Indiana, plants during calendar years 2007 and 2008. Ultimately, the Court agrees with Accubuilt that the parties actually had *two* distinct contracts (or series of contracts) with respect to the Lima and Elkhart plants, and that judgment as a matter of law should be entered in Accubuilt's favor with respect to the dispute concerning the Elkhart contract(s). The parties' respective motions for summary judgment concerning the Lima contract, however, must be denied. The Court will discuss each contract in turn, beginning with the Lima dispute.

### A. Law Applicable to the Lima Dispute[10]

"Where the language of a contract is clear and unambiguous, the interpretation of that contract is a question of law for the court." *Becker v. Rapidigm, Inc.*, No. 1:03CV875, 2005 WL 2397672, at *6 (S.D. Ohio Sept. 28, 2005) (citing *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, 474 N.E.2d 271, 272-73 (Ohio 1984)); John R. Kennel, *Contracts*, 18 OH. JUR. 3RD CONTRACTS § 118. "Conversely, where the terms of a contract are ambiguous and indefinite, determining the intent and meaning of the parties becomes a question of fact for the jury." *Becker*, 2005 WL 2397672, at *6 (citing *Amstutz v. Prudential Ins. Co.*, 26 N.E.2d 454,

---

[10] The parties agree that Ohio law governs their contractual dispute with respect to the Lima plant. Moreover, as noted more fully in note 15, Indiana choice of law rules, which the Court is obligated to follow, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), also point to Ohio substantive law as the applicable authorities to be consulted.

11

456 (Ohio 1940); *GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999));

*Books a Million, Inc. v. H & N Enters., Inc.*, 140 F. Supp. 2d 846, 854 (S.D. Ohio 2001); Kennel,

*supra*, at § 118.

"A contract is ambiguous if it is susceptible to more than one reasonable interpretation."

*Becker*, 2005 WL 2397672, at *6 (citing *Am. Druggists' Ins. Co. v. Equifax, Inc.*, 505 F. Supp.

66 (S.D. Ohio 1980); *City of Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.*,

556 N.E.2d 1186 (Ohio 1990)). "In making the determination of whether language is

ambiguous, courts must generally give words and phrases their plain, ordinary, natural or

commonly accepted meaning." *Id.* (citing *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347

(Ohio 1982)). "Generally, courts presume that the intent of the parties to a contract resides in the

language they chose to employ in the agreement." *Id.* (citing *Shifrin v. Forest City Enters., Inc.*,

597 N.E.2d 499, 501 (1992)); *Am. Coal Sales Co. v. Nova Scotia Power, Inc.*, No. 2:06-cv-94,

2009 WL 467576, at *27 (S.D. Ohio Feb. 23, 2009).

"Parol evidence is admissible only if the terms of the contract are ambiguous and then

only to interpret, but not to contradict, the express language." *Becker*, 2005 WL 2397672, at *6

(citing *Ohio Historical Soc'y v. Gen. Maint. & Eng'g Co.*, 583 N.E.2d 340, 344 (Ohio 1989));

*see Orchard Group, Inc. v. Konica Med. Corp.*, 135 F.3d 421, 429-30 (6th Cir. 1998) (applying

Ohio law); *Am. Coal Sales Co.*, 2009 WL 467576, at *28 ("Ordinarily courts look only to the

language in the contract, but when the court determines that the contractual language is

ambiguous, extrinsic evidence relevant to the parties' intentions may be considered to resolve the

ambiguity, and courts generally construe ambiguities against the drafter."); *Manor Care, Inc. v.

First Specialty Ins. Corp.*, No. 3:03CV7186, 2006 WL 2010782, at *4 (N.D. Ohio July 17,

2006). "Courts should be careful to avoid using extrinsic evidence to create an ambiguity; the ambiguity must be obvious on the face of the written contract." *Am. Coal Sales Co.*, 2009 WL 467576, at *28 (emphasis omitted).

### B. The Parties' Cross-Motions for Summary Judgment Will Be Denied With Respect to the Lima Contractual Dispute

Accubuilt asserts that the Blanket Order constitutes its "offer", that AHS's signed acknowledgment on the Blanket Order is the "acceptance", and that the Daily Releases provide the necessary quantity terms. (Def.'s Br. in Supp. 14.) AHS disagrees, contending that the Letter constitutes the "offer" and the Blanket Order the "acceptance". (Pl.'s Mem. in Supp. 13-15.) Ultimately, the Court need not resolve this dispute for purposes of the instant motions. As noted *supra*, even when accepting Accubuilt's view that the contract is solely comprised of the Blanket Order and the Daily Releases, its summary judgment motion must be denied.[11] And, with respect to AHS's motion, where the facts must be viewed in light most favorable to Accubuilt, the Court must credit Accubuilt's assertion that it never received the Letter. Accordingly, the Court turns its attention to the Blanket Order and the Daily Releases.

Accubuilt contends that the Blanket Order and Daily Releases are clear and unambiguous, and therefore that no extrinsic evidence can be considered under the rules of contract interpretation. Specifically, it asserts that because the Blanket Order reflects a quantity of "0.00", the Lima contract constitutes a "buyer's option" or "open offer to sell", meaning that AHS merely invited it to purchase as much or as little product as it wanted during 2007 and 2008 at the prices set forth on the Price List. *See, e.g.*, *Mayfran Int'l, Inc. v. May Conveyor, Inc.*, No.

---

[11] Of course, the basis for denying Accubuilt's motion for summary judgment is strengthened if the Letter is considered part of the Lima contract documents.

62913, 1993 WL 266944 (Ohio App. July 15, 1993) (finding that a blanket purchase order did not give rise to an obligation to purchase); *In re Modern Dairy of Champaign, Inc.*, 171 F.3d 1106 (7th Cir. 1999) (concluding that a buyer's option existed rather than a requirements contract); James J. White & Robert S. Summers, *Uniform Commercial Code* § 3-9 (5th ed. 2006) (instructing that an agreement that is silent on quantity "is treated as an open offer to sell"). As Accubuilt sees it, it did not become contractually obligated to purchase paint from AHS until it issued a Daily Release for a specific quantity of product, and then it was obligated only to purchase the specific quantity identified on the Daily Release. (Def.'s Reply 13 ("Zero means zero, unless and until supplemented by subsequent releases.").)

In contrast, AHS contends that the "0.00" in the quantity section of the Blanket Order is consistent with a requirements contract, as "exclusive supply/need contracts need not have quantity terms since good faith performance itself supplies a sufficient notion of quantity."[12] *Orchard Group,* 135 F.3d at 429; *see* Ohio Rev. Code § 1302.19; *Puritan Sys., Inc. v. M.G. Indus., Inc*., No. 18093, 1997 WL 775681, at *4 (Ohio App. Oct. 29, 1997) (stating that a requirements contract by its very nature "cannot state a fixed quantity, only that one party will fill all of its requirements exclusively with the other party"). The Daily Releases can then be reasonably viewed as the means chosen by the parties for communicating Accubuilt's daily

---

[12] "A requirements contract is a contract which calls for one party to furnish materials or goods to another party to the extent of the latter's requirements in business." *Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465, 467 (6th Cir. 1989) (applying Ohio law). In order to be valid, "a requirements contract must (1) obligate the buyer to buy goods; (2) obligate the buyer to buy the goods exclusively from the seller; and (3) obligate the buyer to buy all goods of a particular kind from the seller." White & Summers, *supra*, at § 3-9. The standard for requirements contracts is governed by Ohio Revised Code § 1302.19(A), which provides:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

quantity needs. In fact, the sections on the Blanket Order for "Unit Price" and "Extended Price" *also* reflect "$0.00", suggesting that the entries of "0.00" in several categories on the Blanket Order, and in particular under quantity, could merely be the result of using a form document, rather than any sort of conscious expression.

"When there are plausible conflicting interpretations of the words employed in a contract, the agreement becomes ambiguous." *Brakefire, Inc. v. Overbeck*, 878 N.E.2d 84, 99 (Ohio Misc. 2007); *Becker*, 2005 WL 2397672, at *6. Here, both parties' proposed interpretations of the "0.00" in the quantity section of the Blanket Order are plausible. Accordingly, given this ambiguity, it is appropriate to examine extrinsic evidence concerning the parties' intent to resolve the quantity ambiguity. *See Am. Coal Sales Co.*, 2009 WL 467576, at *28.

Turning first to the prior course of dealing between the parties, *see* White & Summers, *supra*, at § 3-9 (explaining that exclusivity for a requirements contract can be established through course of dealing), the parties do not dispute (except for some conflict in testimony about paint for "special" orders) that Accubuilt exclusively purchased paint from AHS for its Lima plant since at least the year 2000, though it purchased paint from other sources for its Elkhart and Springfield plants. *See* White & Summers, *supra*, at § 3-9 (articulating that despite the presence of another supplier, the contract may be sufficiently exclusive where a purchaser agrees to purchase exclusively from a seller up to a certain quantity). In fact, the blanket purchase orders for calendar years 2005 and 2006, years in which Accubuilt purchased all of its paint for the Lima plant from AHS, are strikingly similar to the Blanket Order at issue, including the "0.00" in the quantity section. (Kaufman Dep. Exs. 9, 10.) Nonetheless, in AHS's April 2008 proposal to Accubuilt for calendar year 2009 (delivered prior to Accubuilt's termination of

the Lima contract), AHS makes no mention of "requirements" or "exclusivity", emphasizing instead to Accubuilt that AHS offered "no minimum purchase requirements". (Def.'s Resp. Ex. A.)

As to other extrinsic evidence, it is undisputed that the parties met in October 2006 to discuss Accubuilt's supply needs and that AHS was fully aware of Accubuilt's paint requirements for the Lima plant for the two-year period. In that regard, "[a] promise to purchase exclusively from one supplier may be either implicit or explicit". *See Cyril Bath*, 892 F.2d at 467 (considering, together with other evidence, the seller's awareness of the buyer's supply needs when concluding that a requirements contract existed).

With respect to parole evidence, the testimony is mixed on Accubuilt's part about whether the parties intended to enter into a requirements agreement. Cuzzocrea, Accubuilt's Chief Executive Officer at the time, and Smith, its Director of Operations, both state that it was Accubuilt's intention to purchase all of its 2007 and 2008 requirements for the Lima plant from AHS. Yet, Schlueter, Accubuilt's Chief Operations Officer (who Accubuilt suggests had the "final say" at the time), and Kaufman, its Purchasing Manager, disagree. While Schlueter does recall that "there was agreement to go forward with [AHS] as the supplier" at the October 2006 meeting (Schlueter Dep. 13), he and Kaufman assert that Accubuilt made no commitment for quantities and that the Blanket Order merely identified pricing on a list of materials for a given period of time.[13] Thus, the parole evidence in the record is conflicting with respect to Accubuilt's intent.

---

[13] Of course, Schlueter's phone call to Lahrman of AHS in May 2008 advising him that he thought Accubuilt had met the "dollar" requirement of the contract undercuts his assertion that Accubuilt had no obligation to purchase *any* product from AHS.

In sum, the language of the Blanket Order and Daily Releases, "standing alone, does not establish the existence of a requirements contract." *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999). "Nevertheless, we cannot say that it establishes, as a matter of law, that the contract is not such a contract." *Id.* Rather, the language of the Blanket Order and Daily Releases are susceptible to two interpretations. *See id.* As Accubuilt suggests, it may be construed as an "open offer to sell", or as AHS advocates, it may be the result of the parties' intention to form a requirements contract.

Because of this ambiguity, resort to extrinsic evidence is necessary to further investigate whether the parties intended to enter into a requirements contract. *Id.* at 818. Examination of the extrinsic evidence, however, to the extent that it is developed in the record, together with the parties' dispute concerning whether Accubuilt actually received the Letter referring to "requirements" in October 2006, "supports the conclusion that there exists a genuine issue of triable fact with respect to the parties' intent." *Id.*; *see Becker*, 2005 WL 2397672, at *7 ("[W]here the terms of a contract are ambiguous and indefinite, determining the intent and meaning of the parties becomes a question of fact for the jury."); *Books A Million*, 140 F. Supp. 2d at 853 ("If ambiguity exists, . . . then the meaning of a contract is a question of fact."); Kennel, *supra*, at § 118 ("[I]f the interpretation of the contract requires consideration of evidence extrinsic to the contract, then the courts generally submit such issues to the trier of fact."). Consequently, summary judgment in favor of AHS with respect to the Lima contractual dispute must be DENIED.

With respect to the Elkhart contractual dispute, Accubuilt contends that the Elkhart

contract is comprised solely of the Elkhart Purchase Orders that were accepted by AHS through

performance, while AHS asserts that the Elkhart dispute is controlled by the purported Lima

requirements contract (the Letter and the Blanket Order) formed in October 2006.[15]  In contrast

to its assertions concerning the Lima plant, Accubuilt's arguments pertaining to the Elkhart plant

are ultimately convincing and warrant summary judgment in its favor.

Here, the language of each Elkhart Purchase Order is clear and unambiguous; that is, it is

not susceptible to more than one reasonable interpretation. *Arrotin Plastic Materials of Indiana*

*v. Wilmington Paper Corp.*, 865 N.E.2d 1039, 1042 (Ind. Ct. App. 2007) ("A contract is

ambiguous only where a reasonable person could find its terms susceptible to more than one

interpretation." (citation omitted)).  Each Elkhart Purchase Order is issued from Accubuilt in

---

[14] As noted earlier, and as the facts discussed in this section reveal, the parties actually fashioned two contracts, one for Lima and the other for Elkhart.

[15] Consequently, the parties disagree as to whether Ohio or Indiana law governs the Elkhart contractual dispute.  "When a federal court hears a case in diversity, it does not necessarily apply the substantive law of the forum state; rather, it applies the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, No. 06 C 2092, 2009 WL 2750263, at *2  (7th Cir. Sept. 1, 2009) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  The choice of law rule for Indiana "calls for applying the law of the forum with the most intimate contacts to the facts." *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999).  In making this determination, Indiana follows the approach formulated by the Restatement (Second) of Conflict of Laws and considers: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind. Ct. App. 1997) (citing Restatement (Second) of Conflict of Laws § 188 (1971)); *see also Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1092 (N.D. Ind. 1998).
    As the parties agree, Ohio has the most intimate contacts with the contract arising from the purported Letter, Blanket Order, and Daily Releases for the Lima plant.  The Elkhart Purchase Orders, however, were generated from Accubuilt's Elkhart plant and sent to Dick & Dave's in Elkhart, and the performance of the contract was in Elkhart. (Def.'s Br. in Supp. Ex. D; Lahrman Dep. 8-9.)  Thus, Indiana has the most intimate contacts with the Elkhart contract, and Indiana law applies to the Elkhart dispute.

Elkhart to Dick & Dave's and identifies a specific quantity, type of product, and in most cases, a price. *See Art Country Squire, L.L.C. v. Inland Mortgage Corp*., 745 N.E.2d 885, 889 (Ind. Ct. App. 2001) (instructing that the court's goal is to "give effect to the intentions of the parties as expressed in the four corners of the document"). The Elkhart Purchase Orders make no reference to the Letter, Blanket Order, or Price List, nor do they include any other language obligating Accubuilt to purchase all of the Elkhart plant's requirements exclusively from AHS. *Id*. ("We will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties.").

Furthermore, even if ambiguity existed and the Court would turn to extrinsic evidence, *see Pepsi-Cola Co. v. Steak 'N Shake, Inc*., 981 F. Supp. 1149, 1156 (S.D. Ind. 1997) ("[E]vidence outside the document may be introduced to clarify or interpret an ambiguous term or phrase."), the course of dealing between the parties undercuts AHS's assertion, as Accubuilt historically did not purchase its paint from AHS for the Elkhart plant. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough*, 212 F.3d 373, 380-81 n.7 (7th Cir. 2000) (rejecting the plaintiff's attempt to use evidence of course of dealing where it was inconsistent with the unambiguous terms of the contract); *Orchard Group,* 135 F.3d at 429 (declining to find a requirements contract where the contract's terms failed to expressly create an exclusive relationship and one could not be implied from the parties' prior course of dealing). As to other extrinsic evidence, it is undisputed that the requirements for the Elkhart plant were not discussed at the October meeting between the parties. In fact, the dates of the Elkhart Purchase Orders, April 2007 through September 2008, do not coincide with the term of the Lima contract–Accubuilt began ordering paint from AHS for Elkhart four months after the Lima

contract commenced and it kept ordering for Elkhart two months after its termination. Moreover, it is undisputed that Accubuilt purchased some products for Elkhart that were not included on the Price List and that the service levels were different at the two plants, as AHS mixed the paint and delivered colors to order for the Lima plant while Accubuilt mixed its own paint in Elkhart. (Def.'s Br. in Supp. Exs. D, G; Pl.'s Resp. 7; Def.'s Reply 9.)

Additionally, even if the Court considered the parole evidence pointed to by AHS, which it cannot do since the Elkhart Purchase Orders are unambiguous, this evidence is insufficient to preclude summary judgment on the Elkhart dispute. AHS alleges that Tom Kauble, Accubuilt's Technical Director, asked Jerry Colley in mid-2006 if AHS would supply BASF paint to its Elkhart plant under the same terms and conditions as the Lima facility. Even if this were construed to be an "offer", AHS fails to show that it proffered a valid acceptance, as ten months elapsed after Kauble's alleged request until AHS fulfilled the Elkhart Purchase Order in April 2007. "Unless an offer to form a contract specifically states how long it is open to acceptance, an offer is open only for a reasonable time." *Family Video Movie Club, Inc. v. Home Folks, Inc*., 827 N.E.2d 582, 586 (Ind. Ct. App. 2005) ("How much time is reasonable depends on the facts of each case."). Given the intervening October 2006 meeting where Accubuilt's precise requirements for its Lima plant, but not its Elkhart plant, were discussed in detail, and that such meeting took place *after* Kauble's alleged request, no reasonable jury could conclude that AHS's fulfillment of the Elkhart Purchase Orders commencing in April 2007 was an acceptance of Kauble's purported verbal offer ten months earlier. *See generally Bell Microproducts, Inc. v. Market Dev. Specialists*, No. 3:06-CV-082CAN, 2008 WL 2074134, at *10-11 (N.D. Ind. May 14, 2008) (stating that the interpretation of the purported acceptance or rejection of an offer is a

question of fact).

In sum, the Elkhart Purchase Orders, rather than the purported Lima requirements contract, govern the quantity of products that Accubuilt was obligated to purchase for the Elkhart plant, and they are unambiguous. Since there is no dispute that Accubuilt purchased all of the quantities identified on the Elkhart Purchase Orders (Schlueter Decl. ¶¶ 6, 7), summary judgment will be granted in Accubuilt's favor with respect to the Elkhart dispute.[16]

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Docket # 22) is GRANTED IN PART in that the following claims are dismissed: (1) Plaintiff's breach of contract claim with respect to Defendant's Elkhart, Indiana, facility; and (2) Plaintiff's claim for breach of the duty of good faith and fair dealing. Defendant's motion is otherwise DENIED, and Plaintiff's breach of contract claim with respect to Defendant's Lima, Ohio, plant survives. Plaintiff's Motion for Partial Summary Judgment (Docket # 23) is DENIED.

SO ORDERED.    Enter for the 6th day of October, 2009.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[16] In addition to its breach of contract claim, AHS initially advanced a separate claim against Accubuilt for breach of the "duty of good faith and fair dealing." (Compl. ¶¶ 20-23.) AHS, however, conceded in its response brief that "there is no independent cause of action based upon a breach of a duty of good faith" and thus that summary judgment should be granted on this claim. (Pl.'s Resp. 9.)